# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **SHARON D. FUNK,** ) | |
|    Plaintiff ) | |
| ) | Civil Action No. 2:20cv00038 |
| v. ) | |
| ) | **REPORT AND** |
| **KILOLO KIJAKAZI,**[1] ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** ) | |
|    Defendant ) | By:  PAMELA MEADE SARGENT |
| ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Sharon D. Funk, ("Funk"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Funk protectively filed her application for DIB on December 8, 2015, alleging disability as of January 30, 2014, based on bladder problems; interstitial cystitis; hypertension; diabetes; high cholesterol; gastroesophageal reflux disease, ("GERD"); chronic urinary tract infections; edema in both feet and legs; carpal tunnel syndrome; anxiety; and depression. (Record, ("R."), at 122, 300-02, 345, 357.) The claim was denied initially and upon reconsideration. (R. at 151-53, 157-59, 162-70.) Funk then requested a hearing before an administrative law judge, ("ALJ"). (R. at 171-72.) The ALJ held a hearing on July 6, 2018, at which Funk was represented by counsel. (R. at 40-67.)

The ALJ issued an unfavorable decision on October 9, 2018. (R. at 122-36.) After the ALJ issued his decision, Funk pursued her administrative appeals. (R. at 230-33.) By order dated August 21, 2019, the Appeals Council vacated the hearing decision and remanded Funk's claim, instructing the ALJ to give further consideration to the medical and vocational aspects regarding transferable skills and to Funk's maximum residual functional capacity due to her carpal tunnel syndrome and arthritis. (R. at 15, 142-44.) Upon remand, the ALJ held a hearing on February 7, 2020, at which Funk was represented by counsel. (R. at 69-90.)

By decision dated February 28, 2020, the ALJ denied Funk's claim. (R. at

15-31.) The ALJ found that Funk met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2018. (R. at 17.) The ALJ found Funk had not engaged in substantial gainful activity since January 30, 2014,[2] the alleged onset date. (R. at 17.) The ALJ determined that, through the date last insured, Funk had severe impairments, namely cystitis; varicose veins; edema; hypertension; diabetes; left carpal tunnel syndrome and thumb arthritis with repairs; and osteoarthritis of the right knee, but he found Funk did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 21.) The ALJ found that, through the date last insured, Funk had the residual functional capacity to perform light[3] work that allowed for two hours of sitting per day with occasional lifting of items weighing 20 to 25 pounds; that required no more than occasional climbing, stooping, kneeling, crouching, crawling and operation of foot controls; and that did not require more than frequent handling with the left, nondominant hand. (R. at 22.) The ALJ found that, through the date last insured, Funk was able to perform her past relevant work as an office manager. (R. at 29.) In addition, based on Funk's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, Funk could perform the job of a receptionist, which existed in significant numbers. (R. at 29-30.) Thus, the ALJ concluded that, through the date last insured, Funk was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 30-31.) *See* 20 C.F.R. § 404.1520(f), (g) (2020).

---

[2] Therefore, Funk must show she was disabled between January 30, 2014, the alleged onset date, and June 30, 2018, the date last insured, to be eligible for benefits.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

After the ALJ issued his decision, Funk pursued her administrative appeals, (R. at 484-86), but the Appeals Council denied her request for review. (R. at 1-5.) Funk then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Funk's motion for summary judgment filed June 14, 2021, and the Commissioner's motion for summary judgment filed July 14, 2021.

## II. Facts[4]

Funk was born in 1952, (R. at 300), which, on the date last insured, classified her as a "person of advanced age" under 20 C.F.R. § 404.1563(d). Funk has some college education and past work as an office manager and a cleaner. (R. at 74, 85, 346.)

Rick Bradley, a vocational expert, also was present and testified at Funk's hearing. (R. at 85-89.) Bradley was asked to consider a hypothetical individual who had the residual functional capacity to perform light work that allowed for two hours of sitting in an eight-hour workday; who could occasionally lift items weighing 20 to 25 pounds; who could occasionally operate foot controls; who could occasionally climb, stoop, kneel, crouch and crawl; and who could frequently handle with the nondominant, left hand. (R. at 86.) He stated such an individual could perform Funk's past work as an office manager, as she performed it. (R. at 86.) Bradley stated the office manager job had skills that could transfer

---

[4] The court will limit its discussion to those facts relevant to the time period between January 30, 2014, Funk's alleged onset date, and June 30, 2018, her date last insured.

down to less skilled, sedentary[5] work, including the job of a receptionist. (R. at 87.) He stated there would be no sedentary jobs available should the individual have no more than occasional use of the hands for handling, fingering and feeling. (R. at 88.) Bradley testified the jobs of a receptionist and an office manager would not be available should the individual be off task more than 10 percent of the workday. (R. at 89.)

In rendering his decision, the ALJ reviewed medical records from Joseph Leizer, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Richard Luck, Ph.D., a state agency psychologist; Dr. William Rutherford, Jr., M.D., a state agency physician; Dr. Edmund T. Vu, D.O.; Dr. Jeffrey A. Marchessault, M.D.; Associated Orthopaedics of Kingsport, ("Associated Orthopaedics"); Legacy Vein Center; Holston Valley Medical Center; and Wellmont Medical Associates.

During the relevant time period, Funk received treatment at Wellmont Medical Associates for sinusitis; diabetes; hypertension; hyperlipidemia; low back pain; dysuria; numbness, tingling and pain in her left hand; right knee pain; and right hip pain.[6] (R. at 673-87, 757-79, 1036-44, 1052-55, 1070-79, 1087-90, 1113-18, 1126-30.) During this time, Funk's diabetes, hypertension, hyperlipidemia and anxiety were controlled. (R. at 673, 677-78, 683, 774, 1071.) Examinations

---

[5] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

[6] On May 22, 2018, x-rays of Funk's right hip were normal. (R. at 1118.)

routinely revealed Funk had normal range of motion and reflexes; and her mood, affect, behavior, judgment and thought content were normal. (R. at 676, 680, 685, 757, 763, 1038, 1054, 1072, 1089, 1103.)

On April 30, 2016, Dr. Edmund T. Vu, D.O., examined Funk at the request of Disability Determination Services. (R. at 738-41.) Funk stated she was unable to work due to a bladder problem. (R. at 738.) She reported low back and shoulder pain, depression and swelling in her legs. (R. at 738-39.) Funk reported she was independent with her activities of daily living. (R. at 738.) On examination, Funk ambulated without assistance; she had no muscle asymmetry, atrophy or involuntary movements; she had no joint swelling or tenderness, except for tenderness in the left base of her thumb; her muscle strength was 5/5 in both the upper and lower extremities; her deep tendon reflexes were 2+, bilaterally; she was able to rise from a sitting position without assistance, stand on tiptoes, heels and tandem walk without problems; she was able to bend and squat without difficulty; she had 5/5 grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; she had 2+ edema and venous stasis in her bilateral lower extremities; she was cooperative; she did not appear to be depressed or anxious; she was able to communicate with no deficits; her recent and remote memory were intact; she had good insight and cognitive function; she had good motor tone and strength, bilaterally, in all muscle groups; she had no abnormal reflexes; and her sensation was intact. (R. at 739-40.) Dr. Vu diagnosed diabetes type II; hypertension; interstitial cystitis; left hand tendonitis, most likely arthritis; edema of the lower extremities due to venous stasis; and hyperlipidemia. (R. at 740.)

Dr. Vu opined Funk could sit for a full workday; she could lift and carry

items weighing less than 10 pounds; she could hold a conversation and respond appropriately to questions; she could remember and carry out instructions; and she was unable to stand all day without rest periods. (R. at 740.)

On May 9, 2016, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding Funk could perform light work. (R. at 99-100.) He found Funk could frequently climb ramps and stairs, balance and kneel; and occasionally climb ladders, ropes or scaffolds, stoop, crouch and crawl. (R. at 100.) Dr. Spetzler found Funk had no manipulative, visual, communicative or environmental limitations. (R. at 100.)

On May 17, 2016, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating Funk did not have a medically determinable mental impairment. (R. at 97-98.)

On September 8, 2016, Whitney B. Mays, N.P., a nurse practitioner with Wellmont Medical Associates, saw Funk for her complaints of low back pain and dysuria.[7] (R. at 774-79.) Funk had reduced range of motion and tenderness in her lumbar back, and she had a normal mood, affect, behavior, judgment and thought content. (R. at 776.)

On September 8, 2016, Mays and Dr. Maurice E. Nida, D.O., completed a mental assessment, indicating Funk had no limitations in her ability to follow work rules; to relate to co-workers; to understand, remember and carry out simple job

---

[7] Funk reported medication helped her symptoms of anxiety, but she stated she still experienced episodes of anxiety. (R. at 774.) She related her anxiety symptoms to taking care of her sick husband and helping "a lot with other things." (R. at 774.)

instructions; to maintain personal appearance; and to behave in an emotionally stable manner. (R. at 780-82.) They found Funk had slight limitations in her ability to interact with supervisors; to understand, remember and carry out detailed job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 780-81.) Funk had a satisfactory ability to deal with the public; to use judgment in public; and to understand, remember and carry out complex job instructions. (R. at 780-81.) Mays and Dr. Nida opined Funk had serious limitations, resulting in unsatisfactory work performance, in her ability to function independently and no useful ability to deal with work stresses and to maintain attention and concentration. (R. at 780.) They opined Funk would be absent from work more than two days a month. (R. at 782.) Mays and Dr. Nida indicated their findings were based on Funk's severe anxiety and depression and her scattered thoughts. (R. at 781.)

On December 6, 2016, Dr. William Rutherford, Jr., M.D., a state agency physician, completed a medical assessment, finding Funk could perform light work. (R. at 113-14.) He found Funk could frequently climb ramps and stairs, balance and kneel; and occasionally climb ladders, ropes or scaffolds, stoop, crouch and crawl. (R. at 114.) Dr. Rutherford found Funk had no manipulative, visual, communicative or environmental limitations. (R. at 114.)

On December 7, 2016, Richard Luck, Ph.D., a state agency psychologist, completed a PRTF, indicating Funk suffered from nonsevere anxiety disorders. (R. at 111-12.) He opined Funk had mild limitations in her restriction of activities and in maintaining social functioning, and she had no difficulties in maintaining concentration, persistence or pace. (R. at 111.) He also found Funk had experienced no repeated episodes of decompensation for an extended duration. (R.

Pageid#: 1336

at 111.)

On October 7, 2017, Mays completed a medical assessment, indicating Funk could occasionally and frequently lift and carry items weighing less than 10 pounds; she could stand and/or walk a total of less than one hour in an eight-hour workday; she had no limitations in her ability to sit; she could frequently balance, but never climb, stoop, kneel, crouch or crawl; she had a limited ability to handle, to feel and to push/pull; and she would be absent from work more than two days a month. (R. at 1001-03.)

That same day, Mays completed a mental assessment, indicating Funk had no limitation in her ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment in public; to interact with supervisors; to understand, remember and carry out simple and complex job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 1004-06.) She found Funk had a slight limitation in her ability to function independently. (R. at 1004.) Mays opined Funk had a satisfactory ability to understand, remember and carry out detailed job instructions, but a seriously limited ability, resulting in unsatisfactory work performance, in dealing with work stresses and in maintaining attention and concentration. (R. at 1004-05.) She found Funk would be absent from work more than two days a month. (R. at 1006.) Mays indicated her findings were supported by Funk's anxiety, inability to handle stress and inability to focus. (R. at 1005.)

On April 9, 2018, Dr. Jeffrey A. Marchessault, M.D., an orthopedic surgeon, examined Funk for complaints of left hand numbness, involving the thumb, index

and middle fingers. (R. at 1025-26.) Funk stated she previously had carpal tunnel surgery on the right with good relief. (R. at 1025.) Funk was pleasant and cooperative; she had no atrophy in the left hand; and she had positive Tinel's and Phalen's tests. (R. at 1025.) X-rays of Funk's hands showed Eaton stage II disease[8] of the left thumb carpometacarpal, ("CMC"), joint, and she had hyperextension of no more than 10 degrees at the metacarpophalangeal ("MCP"), joint. (R. at 1026.) Dr. Marchessault diagnosed left carpal tunnel syndrome and left thumb CMC arthritis. (R. at 1026.) On April 17, 2018, Dr. Marchessault performed a left thumb CMC arthroplasty; a left flexor carpi radialis tendon transfer for ligament reconstruction and tendon interposition; and a left open carpal tunnel release.[9] (R. at 1027-28.)

On May 5, 2018, Mays reported Funk's lumbar back exhibited decreased range of motion and tenderness; she had normal reflexes; and she had a normal mood, affect, behavior, judgment and thought content. (R. at 1116.)

On May 15, 2018, Mays completed a medical assessment, indicating Funk could occasionally lift and carry items weighing five pounds and frequently lift and carry items weighing less than five pounds; she could stand and/or walk for 30 minutes without interruption; she could sit for 30 minutes without interruption; she could never climb, stoop, kneel, balance, crouch or crawl; she had a limited ability to reach, to handle, to feel and to push/pull; she was restricted from working

---

[8] Eaton-Lambert syndrome is an autoimmune disorder that impairs communication between nerves and muscles, causing weakness. *See* https://www.merckmanuals.com/home/brain,-spinal-cord,-and-nerve-disorders/peripheral-nerve-and-related-disorders/eaton-lambert-syndrome (last visited Jan. 21, 2022).

[9] Funk participated in occupational therapy for chronic thumb pain due to arthritis from April 23, 2018, through June 11, 2018. (R. at 1136-60.)

around heights, moving machinery and vibration; and she would be absent from work more than two days a month. (R. at 1110-12.)

On May 30, 2018, Funk saw Dr. Marchessault and reported she was pleased with the results of her left thumb CMC arthroplasty and carpal tunnel release surgery. (R. at 1120.) Dr. Marchessault reported Funk could make a composite fist, and x-rays of her left hand showed good spacing between the thumb metacarpal bone and scaphoid bone. (R. at 1120.) Dr. Marchessault discontinued use of the brace and continued Funk on strengthening exercises. (R. at 1120.)

On June 7, 2018, Funk saw Dr. Alli D. Delp, D.O., a physician with Wellmont Medical Associates, and reported right knee pain. (R. at 1126.) She stated she had loss of motion and was unable to bear weight on her right lower extremity. (R. at 1126.) Funk had normal range of motion in her neck; she had swelling in her right knee, but normal range of motion; she had no effusion, deformity, laceration or erythema, but there was tenderness along the tibial plateau; and she had normal mood, affect and behavior. (R. at 1129.) X-rays of Funk's right knee showed mild arthritis and a sclerotic lesion in her distal femur. (R. at 1130.) Dr. Delp diagnosed right knee pain. (R. at 1130.)

On June 12, 2018, Jill Henritze, P.A.-C., and Dr. Bruce M. Miller, M.D., of Associated Orthopaedics, saw Funk for complaints of right knee pain. (R. at 1133.) Funk's bilateral lower extremities had good range of motion; she had patellofemoral crepitus; she had no joint effusion, erythema or increased warmth; her straight leg raising tests were negative; and she had normal sensation with good pedal pulse. (R. at 1133.) X-rays of Funk's right knee showed fibrous cortical changes in the distal femur, which was most likely some bony island infarct, and

-11-

tricompartmental osteoarthritis in the right knee, with the medial and patellofemoral areas being the worst. (R. at 1133.) Funk was diagnosed with right knee medial compartment and patellofemoral osteoarthritis, and she received an injection to the right knee. (R. at 1133.)

On June 22, 2018, Funk was seen at the Legacy Vein Center for complaints of varicose veins with aching, swelling and heaviness of the right lower extremity. (R. at 1161-64.) Funk was diagnosed with varicose veins of the bilateral lower extremities with pain and inflammation. (R. at 1161, 1163.)

On June 27, 2018, Funk saw Dr. Marchessault, reporting she was pleased with the results of her surgery and stating she was able to resume her activities of daily living. (R. at 1166.) Funk had a Kapandji[10] score of nine; she could make a full composite fist; and she had "a little bit" of soft tissue swelling over the ulnar side of the thumb, which was believed to be soft tissue granulation. (R. at 1166.) Dr. Marchessault released Funk to unrestricted activities. (R. at 1166.)

On July 24, 2018, Funk saw Henritze and Dr. Miller, reporting the injection to her right knee was effective and that she was "doing great." (R. at 1245.) She stated she was able to do all her normal activities. (R. at 1245.) Funk had "great" range of motion of the knee, and she voiced no complaints of pain. (R. at 1245.)

On July 27, 2018, Funk denied depression and reported she was able to cope with stress effectively. (R. at 1226.) She stated she was able to drive alone; cook;

---

[10] The Kapandji score is used to record thumb opposition. A Kapandji score greater than six does not necessarily reflect thumb opposition. *See* https://journals.sagepub.com/doi/abs/10.1177/1753193419843837 (last visited Jan. 21, 2022).

plan meals; do heavy housework; and exercise. (R. at 1226-27.) Mays reported Funk's examination was normal. (R. at 1228.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.

This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Funk argues the ALJ erred by improperly determining her residual functional capacity by rejecting the opinions of her treating nurse practitioner, Mays, and her treating physician, Dr. Nida, and by giving controlling weight to the opinions of the state agency psychologists. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Funk contends the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. Instead, the ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2020); *see also* 20 C.F.R. § 404.1527(d)(2) (2020) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner). The relevant question is whether the ALJ's residual functional capacity assessment is based upon all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and description of his own limitations. *See* 20 C.F.R. § 404.1545.

The ALJ found that, through the date last insured, Funk had the residual functional capacity to perform light work that allowed for two hours of sitting per day with occasional lifting of 20 to 25 pounds; that required no more than occasional climbing, stooping, kneeling, crouching, crawling and operation of foot controls; and that did not require more than frequent handling with the left, nondominant hand. (R. at 22.)

In making this residual functional capacity finding, the ALJ stated he was giving "limited weight" to Dr. Vu's opinion; giving "little weight" to Dr. Nida's and Mays's opinions; and giving "significant weight" to the state agency consultants' assessments. (R. at 27-29.) The ALJ gave Dr. Vu's opinion "limited weight" because it was more "restrictive than warranted by his contemporaneous examination findings." (R. at 27-28.) As noted by the ALJ, Dr. Vu found Funk's examination findings showed no physical abnormalities other than tenderness of her left thumb and lower extremity edema. (R. at 28, 739-40.) The ALJ found Dr. Vu noted no physical abnormalities to support a limitation of lifting and carrying items weighing less than 10 pounds. (R. at 28, 740.) To accommodate for Dr. Vu's standing restriction, the ALJ limited Funk to work that allowed sitting for two hours during the workday. (R. at 28.)

The ALJ gave Mays's medical assessments "little weight" because they were inconsistent with her own treatment notes and the medical evidence of record. (R. at 28-29.) In addition, the ALJ found Mays was not an acceptable medical source. (R. at 28.) As a nurse practitioner, Mays is not considered an acceptable medical source as defined by the Act. *See* 20 C.F.R. § 404.1513(a) (2016) (defining acceptable medical sources as licensed physicians, licensed or certified psychologists, and – for limited purposes – licensed optometrists, licensed

podiatrists and qualified speech-language pathologists). Evidence from such nonacceptable medical sources cannot be used to establish the existence of a medically determinable impairment, but they may "provide evidence, including opinion testimony, regarding the severity of the claimant's impairments and [how] such impairment[s] affect the individual's ability to function." *Ingle v. Astrue*, 2011 WL 5328036, at *3 (W.D. N.C. Nov. 7, 2011) (citing S.S.R. 06-03p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013); 20 C.F.R. § 404.1513(d)).

As noted by the ALJ, Funk's musculoskeletal examination findings were generally normal, except for a couple of visits where she had decreased range of motion and tenderness in the lumbar spine. (R. at 28, 676, 680, 685, 739-40, 757, 763, 776, 1038, 1054, 1072, 1089, 1103, 1116, 1228, 1233, 1239, 1270.) In April 2018, Funk underwent a left thumb CMC arthroplasty; a left flexor carpi radialis tendon transfer for ligament reconstruction and tendon interposition; and a left open carpal tunnel release. (R. at 1027-28.) In May 2018, x-rays of Funk's right hip were normal. (R. at 1118.) In June 2018, x-rays of Funk's right knee showed mild arthritis and a sclerotic lesion in her distal femur, and Henritze and Dr. Miller found Funk's bilateral lower extremities had good range of motion; she had patellofemoral crepitus; she had no joint effusion, erythema or increased warmth; her straight leg raising tests were negative; and she had normal sensation with good pedal pulse. (R. at 1130, 1133.) In July 2018, Henritze noted Funk had "great" range of motion of the knee and no complaints of pain. (R. at 1245) Funk also reported good relief with bilateral carpal tunnel release. (R. at 1025, 1166.) She also reported the injections to her right knee were effective, and she was doing "great." (R. at 1245.) Funk stated she was able to independently perform her activities of daily living, and Dr. Marchessault released her to unrestricted

activities. (R. at 738, 1166, 1245.) Furthermore, in April 2019, x-rays of Funk's lumbar spine and hip showed only mild to moderate degenerative changes. (R. at 1210.)

The ALJ gave "little weight" to Dr. Nida's and Mays's mental assessments because they were not supported by the medical record. (R. at 28-29.) The record shows that Funk consistently had normal mental status examination findings. (R. at 680, 685, 739-40, 757, 763, 776, 1038, 1054, 1072, 1089, 1103, 1116, 1228, 1233, 1239, 1270.) In fact, Funk denied depressive symptoms and stated she could effectively cope with stress because medication helped her symptoms of anxiety. (R. at 774, 1226.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In fact, Funk reported she was able to independently perform her activities of daily living; she took care of her sick husband and helped "a lot with other things;" she could drive alone; she could prepare meal plans and cook; she performed heavy housework; and she exercised by way of walking. (R. at 738, 774, 1166, 1226-27.)

The ALJ gave "significant weight" to the state agency physicians' assessments, who, after reviewing the medical evidence, opined Funk could perform light work with occasional postural activities, except she could frequently climb ramps and stairs, balance and kneel. (R. at 27, 99-100, 113-14.) The ALJ also gave the state agency psychologists' assessments "significant weight" because they were consistent with the medical record as a whole. (R. at 27, 97-98, 111-12.) Under the regulations, the ALJ was entitled to rely on the state agency psychologists' and physicians' assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2020) ("State agency medical or psychological consultants are highly qualified

-17-

and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Funk argues that the ALJ should have given the state agency consultants' assessments less weight because they were "stale [and] outdated," because they did not have the benefit of reviewing the updated records and opinions from her treating providers. (Plaintiff's Brief at 6.) However, the simple fact that those opinions came later in time than the state agency opinions does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

It is apparent from the ALJ's very thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence, and he ultimately found the state agency medical opinions were consistent with the

-18-

record as a whole. Here, the opinions of the state agency consultants that Funk could perform a limited range of light work were consistent with the evidence of record. Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding that, through the date last insured, Funk had the residual functional capacity to perform a limited range of light work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding;

3. Substantial evidence exists in the record to support the ALJ's finding that Funk could perform her past work as an officer manager; and

4. Substantial evidence exists in the record to support the Commissioner's finding that, as of the date last insured, Funk was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Funk's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:   January 24, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE